**IN THE UNITED STATES DISTRICTCOURT**
**DISTRICT OF SOUTH CAROLINA**
**FLORENCE DIVISION**

**William Finley, III,**
**Plaintiff,**

**v.** **Case No.: 6:24-cv-1672-JDA**

**3M Company,**
**Defendant.**

## PLAINTIFF’S FIRST AMENDED COMPLAINT AND JURY DEMAND

Plaintiff, William Finley, III (“Plaintiff”), by and through his undersigned counsel, brings this Amended Complaint and Jury Demand against Defendant 3M Company (“Defendant”) based on the allegations set forth below.

## INTRODUCTION

1. This is an action for damages relating to Defendant’s design, development, testing, manufacturing, packaging, promoting, marketing, distribution, leasing, supplying, and/or selling of the Bair Hugger Forced Air Warming device (hereinafter “Bair Hugger”).

2. Defendant and its predecessors in interests have designed, developed, tested, manufactured, packaged, promoted, marketed, distributed, supplied, leased, and/or sold the Bair Hugger for well over 30 years. To this day, tens of thousands of patients in hospitals all across the United States undergo surgery each month involving intraoperative use of the Bair Hugger.

3. The Bair Hugger consists of a portable heater or blower connected by a flexible hose to a disposable blanket that is placed over (or in some cases under) surgical patients. The Bair Hugger intakes air from the surrounding area (often from the nonsterile floor of the operating room) and passes it through the intake filter and internal air pathways of the machine and into an

outlet hose. The warm air travels through the distal end hose, which does not have an air filter, and into the blanket, which has different compartments through which the warm air moves. The warm air exits the blanket through multiple holes over a patient's exposed skin, providing warmth to the patient during surgery.

4. While warm air accumulates under the surgical drape covering the patient, the air escapes from multiple places. The escaped air creates airflow and/or convection currents that push against and disrupt the downward airflow of the operating theater.

5. Scientific studies have shown that as this warmed air rises against the downward airflow in the operating room, it deposits bacteria from the non-sterile portions of the operating theater to the surgical site.

6. Scientific studies have also shown that the inadequate air filtration system of the Bair Hugger allows pathogenic-carrying cells, including but not limited to isolates of *S aureus*, coagulase-negative *staphylococci* ("CoNS"), and methicillin-resistant *staphylococcus aureus* ("MRSA"), to penetrate the intake filter of the device and colonize inside the device.

7. Indeed, as the device sits on or near the floor of the operating theater, often directly next to the operating table, it intakes large quantities of desquamated skin cells and other viable microorganisms that have been pushed down to the non-sterile floor of the operating theater. In some cases, these microorganisms move through the intake filter and attach to the inner pathways of the device; in other cases, they enter through gaps between the filter and the device or between the distal end hose and the device. Because the internal air path surfaces of the device cannot be easily cleaned or decontaminated, and the operating instructions for the device do not provide a method for cleaning or decontaminating the inside of the device, microorganisms build up and

colonize therein. Without an adequate filtration system at the distal hose outlet, the device releases contaminants into the operating theater and directly onto the surgical site itself.

8. For over two decades, Defendant has known that the Bair Hugger emits significant levels of internally generated airborne contaminants into the operating theater and that the exhaust generated thereby creates convective airflow patterns that disrupt the unidirectional airflow of the operating theater, dramatically increasing the risk of infection for patients undergoing lengthy surgeries, especially hip and knee replacement surgeries.

9. In June 1997, in sworn filings submitted to the Food and Drug Administration ("FDA") in connection with Section 510k of the Food and Drug Act, Defendant's predecessor, Augustine Medical, Inc., admitted that "[a]irborne contamination from air blown intra-operatively across the surgical wound may result in airborne contamination."[1]

10. Notwithstanding their knowledge of that risk and the availability of safer alternative designs, Defendant actively and aggressively marketed the Bair Hugger as safe in both general and orthopedic surgeries.

11. Defendant also misrepresented that the air filtration system of the Bair Hugger satisfied High Efficiency Particulate Air ("HEPA") standards.

12. Though Defendant touted the Bair Hugger as HEPA compliant to healthcare providers and informed the FDA of the same, the Bair Hugger has never met that standard.

13. Upon information and belief, at some point between 2002 and 2009, Defendant significantly reduced the efficiency of the Bair Hugger's air filtration system.

---

[1] *See* 510(k) Summary of Safety & Effectiveness for the Bair Hugger Patient Warming System, Model 525 Blanket (K903360) (June 26, 1997), https://www.accessdata.fda.gov/cdrh_docs/pdf/K964673.pdf. (last visited Aug. 13, 2024).

14. As a result of that decision, the internal airflow pathways of the Bair Hugger become contaminated with pathogens, including isolates of CoNS, mold, and other bacteria, which incubate and proliferate therein. And since the defective design of the device does not include an outlet filter—let alone a HEPA-complaint filter, the Bair Hugger releases contaminants into the operating theater and onto the surgical site.

15. Upon information and belief, Defendant has been aware of the pathogenic contamination of the internal airflow pathways of the Bair Hugger since at least as early as 2009.

16. Contemporaneous publication of scientific studies identifying these issues and the availability of alterative designs should have prompted Defendant to discontinue marketing and selling the Bair Hugger until they could redesign the device to prevent the spread of bacterial contamination.

17. At a minimum, Defendant should have warned patients and healthcare providers of the known risk inherent in using the Bair Hugger in orthopedic surgeries.

18. Instead, amid rising criticism of the Bair Hugger among the medical community, Defendant callously and with conscious disregard of patient safety chose to amplify its efforts to champion the device and silence critics.

19. In fact, Defendant has taken every step imaginable to conceal and discredit peer-reviewed scientific studies that undermine their ability to market the Bair Hugger.

20. Because of Defendant’s actions and inactions, Plaintiff was injured due to the use of the Bair Hugger, which has caused and will continue to cause bacteria to enter the surgical site, resulting in a dramatic increase in the rate of periprosthetic joint infections (“PJIs”) among all patient populations. These infections have caused Plaintiff William Finley, III to undergo surgical

debridement, premature prosthetic replacement, extended hospital stays, multiple surgeries and high dose intravenous antibiotic treatment.

21. Plaintiff therefore demands judgment against Defendant and requests, among other things, compensatory damages, statutory damages, attorneys' fees, and costs.

## PARTIES

22. Plaintiff is a citizen and/or resident of the State of South Carolina. Plaintiff experienced severe medical complications, injuries, and damages from the use of the Bair Hugger.

23. At the time Plaintiff underwent surgery with a Bair Hugger device, Plaintiff was a resident of the State of South Carolina. At no time was Plaintiff a resident or a citizen of the State of Minnesota.

24. Defendant 3M Company ("3M") is a corporation organized and existing under the laws of Delaware, with its principal place of business in Maplewood, Minnesota. 3M is engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, leasing, supplying, selling, marketing, and introducing into interstate commerce, either directly or indirectly, products such as the Bair Hugger.

25. At all times mentioned herein, the employees of Defendant, its subsidiaries, predecessors in interest, affiliates, and other related entities, as well as the employees of Defendant's subsidiaries, predecessors in interest, affiliates, and other related entities, were the agents, servants, and employees of Defendant and were acting within the purpose and scope of said agency and employment. Whenever reference is made to any act or transaction of Defendant, such designations shall be deemed to mean that the principals, officers, employees, agents, and/or representatives of Defendant committed, knew of, performed, authorized, ratified, and/or directed

such transactions on behalf of Defendant while they were actively engaged in the scope of their duties.

## JURISDICTION AND VENUE

26. This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) because the parties are citizens of different States and the amount in controversy exceeds the sum or value of $75,000, exclusive of interests and costs.

27. At the time of filing his short form complaint on August 8, 2018, Plaintiff alleged that absent the direct filing order which allowed for filing in the MDL, venue might be proper in either The United States District Court, District of South Carolina, Florence Division.

28. Defendant is subject to the *in personam* jurisdiction of this Court, and venue is proper in this judicial district pursuant to 28 U.S.C. § 1391, as a substantial number of the events, actions, or omissions giving rise to Plaintiff’s claims occurred in this district, and at all times relevant to this matter, Defendant conducted substantial business in this judicial district. Defendant did (and continues to do) business within the state of South Carolina and has substantial, continuous, and systematic contacts with the state of South Carolina. Defendant has consented to jurisdiction in the state of South Carolina and/or committed torts in whole or in part in the state of South Carolina and many other states, against Plaintiff, as more fully set forth below. On information and belief, Defendant has marketed, advertised, and sold the Bair Hugger in the District of South Carolina. Defendant has also made material omissions and representations in the District of South Carolina and breached warranties in the District of South Carolina.

## FACTUAL BACKGROUND

### A. Plaintiff’s Injury

29. On or about June 11, 2015, Plaintiff William Finley, III, underwent an initial right knee replacement at Patewood Memorial Hospital.

30. At the time of his initial right knee replacement surgery, a Bair Hugger warming device was used during the course of the surgery.

31. Contaminants were introduced into Mr. Finley's open surgical site during the course of his orthopedic procedure due to the defects in the Bair Hugger which resulted in Mr. Finley developing a deep joint infection.

32. As a result of the infection, Mr. Finley was forced to undergo various surgeries and antibiotic treatment courses in hopes of eradicating his deep joint infection.

33. On September 18, 2015, Plaintiff underwent an incision, drainage, and irrigation of the right knee and an "exploration of the wound with polyethylene exchange." Cultures were positive for methicillin-sensitive Staphylococcus aureus. Plaintiff received a PICC line and was treated with antibiotics.

34. On October 8, 2015, Plaintiff was admitted into Greenville Memorial and evaluated by healthcare providers in the Infectious Disease department. Following his release from Greenville Memorial, Mr. Finley had home health care set up to help with his routine care for the PICC line and his antibiotic treatment.

35. On or about May 2, 2016, Mr. Finley underwent removal of his infected right total knee arthroplasty and was implanted with an "articulating spacer using antibiotics cement with vancomycin and tobramycin in the cement" to treat his deep joint infection.

36. On or about July 22, 2016, Mr. Finley underwent removal of the spacer and a revision of the right knee replacement.

37. The development of Plaintiff's injuries was preventable and resulted directly from Defendant's failure and refusal to conduct proper safety studies, failure to properly assess and publicize safety signals, suppression of information revealing serious risks, willful and wanton failure to provide adequate instructions, and willful misrepresentations concerning the nature and safety of Bair Hugger. This conduct, as well as the product defects complained of herein, was a substantial factor in bringing about Plaintiff's injuries.

38. Plaintiff's injuries were a reasonably foreseeable consequence of Defendant's conduct and the Bair Hugger's defects.

39. At all times material hereto, Defendant, by and through its agents, servants and employees, negligently, recklessly and carelessly marketed, distributed and sold the Bair Hugger without adequate instructions or warning of its serious side effects and unreasonably dangerous risks.

40. As a direct and proximate result of Defendant's negligence, wrongful conduct, and the unreasonably dangerous and defective characteristics of the Bair Hugger, Plaintiff suffered infections, requiring additional surgical procedures to clean the infected areas, removal of the implant and placement of antibiotic spacer, and extended treatment with high dose antibiotics. Plaintiff has therefore suffered damages and will continue to incur medical expenses as a result of using the Bair Hugger. Plaintiff has also suffered a diminished capacity for the enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation of preexisting conditions, activation of latent conditions, and other losses and damages. Plaintiff's direct medical losses and costs include care for hospitalization, physician care, monitoring, treatment, medications, and supplies. Plaintiff has incurred and will continue to incur mental and physical pain and suffering.

41. As a result of Defendant's actions, Plaintiff and his physicians were unaware, and could not have reasonably known or have learned through reasonable diligence that Plaintiff would be exposed to the risks identified in this Complaint and that those risks were the direct and proximate result of Defendant's conduct.

**B. History of the Bair Hugger**

42. The Bair Hugger was developed by Augustine Medical, Inc. in the mid-1980s.

43. When Augustine Medical, Inc. reorganized in or around 2003, the division of the company that retained the Bair Hugger product line became Arizant.

44. In 2004, Citigroup Venture Capital purchased Arizant for $225 million.

45. In 2010, Defendant 3M purchased Arizant and all rights to the Bair Hugger product line for $810 million. Defendant 3M also purchased all the liabilities associated with the Bair Hugger.

46. Defendant and its predecessors in interest have designed, developed, tested, packaged, manufactured, promoted, marketed, distributed, leased, supplied, and/or sold a variety of Bair Hugger models, including but not limited to the Bair Hugger 505, 750, and 775.

**C. Use of the Bair Hugger in the Operating Room**

47. More than 50,000 Bair Hugger units are currently in use across the country.

48. Some of the Bair Hugger models cover only a portion of the patient's body; others cover the patient's entire body. Still others are used under a patient's body in order to allow physicians full access to the patient during surgery.

49. Despite those differences, all Bair Hugger models consist of a portable temperature management unit and a disposable blanket. Every model also includes a distal end hose that not

only accumulates and allows bacteria to proliferate therein, but blows hot air and contaminants into the blanket, over the patient's skin, and into the operating environment.

50. Defendant marketed the Bair Hugger to healthcare providers as being able to "meet [their] everyday and specialized patient warming needs—from pediatric to geriatric [and] from brief outpatient procedures to long complex procedures."[2]

51. Defendant therefore advertised the Bair Hugger as a suitable forced air warming device for use by all patients, regardless of their medical needs or background.

52. After all, the Bair Hugger's marketing slogan once stated, "Everyone Deserves a Hugg,"[3] even though the device is neither safe nor effective for use in general or orthopedic surgeries.

53. The Bair Hugger produces hot air that builds up in areas around the patient, particularly under the surgical drape covering the patient. Not all of the hot air produced by the Bair Hugger remains there, however. Much of the hot air escapes from under the surgical drape below the level of the surgical table or at the head end of the surgical table. The escaped air then creates convection currents that flow against the downward airflow of the operating theatre. As this warmed air rises, it deposits bacteria and other dangerous pathogens from the non-sterile floor of the operating theater directly to the surgical site.

54. These bacteria, including but not limited to *staphylococcus aureus*, CoNS, and MRSA, can and do lead to deep joint or "periprosthetic joint infections" for all types of patient populations, including Plaintiff herein.

---

[2] *See, e.g.*, 3M Company, http://solutions.3m.com/wps/portal/3M/en_EU/HealthcareEurope/EU-Home/Products/InfectionPrevention/Patient_Warming/Bair_Hugger_Ther apy/Blankets/ (last visited April 27, 2016).
[3] *See, e.g.*, 3M Company, Bair Hugger Therapy 700 Series Temperature Management Unit, Troubleshooting Guide, http://multimedia.3m.com/mws/media/798477O/model700-troubleshooting-guide-english.pdf (last visited April 27, 2016).

55. What's more, the Bair Hugger itself generates airborne contamination that significantly increases the risk of infection for patients undergoing surgeries of all kinds.

56. In a communication to the FDA in July 2000, Defendant asserted that the Bair Hugger's filtration system satisfied HEPA standards. That statement could not have been further from the truth. To qualify as HEPA complaint, an air filter must remove at least 99.97% of all particles 0.3 micrometers or larger from the air that passes through it.

57. Though Defendant marketed and continues to market the Bair Hugger as HEPA complaint, it removes no more than 63.8% of particles 0.3 micrometers or larger.[4]

58. Leaks on the intake side of the device and inadequate air intake filtration can and do lead to buildup of microbial contamination in the internal passageways of the device and adjoining hose. At least one scientific study has revealed the presence of viable microorganisms in 100% of Bair Hugger devices, with the heaviest growth reported on the internal air path surfaces of the "elbow" of the device. Isolates of CoNS, mold, and *micrococci* were detected inside 74%, 26%, and 9% of Bair Hugger blowers, respectively.[5]

59. Because much of the buildup occurs on inaccessible internal pathways of the device that cannot be easily cleaned, decontaminated, or replaced, the Bair Hugger generates significant levels of airborne contamination downstream of its intake filter.

60. One scientific study concluded that the Bair Hugger emits up to 35,000 particles per cubic foot downstream of its intake filter;[6] another study found that the device releases up to

---

[4] *See, e.g.*, Reed, M., et al. Forced-Air Warming Design: Evaluation of Intake Filtration, Internal Microbial Buildup, and Airborne-Contamination Emissions. *Am Assoc Nurse Anesth J* 2013;81:275-80.

[5] *See id.*

[6] *See* Albrecht, M., et al. Forced-Air warming blowers: An evaluation of filtration adequacy and airborne contamination emissions in the operating room. *Am J Infect Control* 2011;39:321-28.

110,000 particles per cubic foot downstream of its filter, which translates to more than 80,000 particles per second being emitted from the distal end hose of the device.[7]

61. After those particles and other bacteria are expelled from the interior of the Bair Hugger by an outward airflow, they travel into the warming blanket, escape from the holes in the blanket, and land directly onto the surgical site, thereby infecting patients.

62. Upon information and belief, Defendant has known for nearly two decades that the Bair Hugger's inadequate air filtration system and its tendency to disrupt convention currents in the operating theater increase the risk of surgical site and deep joint infections.

**D. Defendant's Marketing and Misrepresentations that the Bair Hugger is Safe for Use**

63. Notwithstanding their knowledge of those risks and the availability of safer alternative designs, Defendant has continued to market the Bair Hugger to consumers and healthcare providers and to misrepresent the safety of the device in its advertisements, statements to healthcare providers, and submissions to the FDA.

64. In a June 1997 letter to the FDA, for example, Defendant admitted that "air blown intraoperatively across the surgical wound may result in airborne contamination."[8]

65. Defendant addressed that fundamental flaw in the Bair Hugger by making additional misrepresentations to the FDA. Defendant informed the FDA that they had remediated that particular flaw by employing a tape barrier in all Bair Hugger models and that such a barrier would "prevent air from migrating toward the surgical site."[9]

---

[7] *See* Reed, M., et al. Forced-Air Warming Design: Evaluation of Intake Filtration, Internal Microbial Buildup, and Airborne-Contamination Emissions. *Am Assoc Nurse Anesth J* 2013;81:275-80.
[8] *See* 510(k) Summary of Safety & Effectiveness for the Bair Hugger Patient Warming System, Model 525 Blanket (K903360) (June 26, 1997), https://www.accessdata.fda.gov/cdrh_docs/pdf/K964673.pdf. (last visited Aug. 13, 2024).
[9] *See id.*

66. That statement was false and misleading, and it remains uncorrected to this very day. Not only are many Bair Hugger models not equipped with a taped edge at all, but even the use of a taped edge cannot prevent hot air from migrating up from the nonsterile floor of the operating theater. The cooler downward airflow in the operating theater causes the hot air from the Bair Hugger to rise upward and move toward the surgical site. The presence of a tape barrier thus does not prevent the Bair Hugger from facilitating the movement of bacteria from the floor of the operating theater to the surgical site. Nor has the Defendant done anything to remediate the inadequate air filtration system of the device.

67. Defendant's misrepresentations did not stop with the FDA. For many years, Defendant's website, www.fawfacts.com/laminar_airflow/ (last visited January 20, 2016), contained a multitude of additional misrepresentations, including but not limited to:

a. Contamination mobilized by the convection currents generated by the Bair Hugger cannot reach the surgical site because "[a]ir velocity within the operating room is many times stronger than that of a forced-air warming blanket";

b. "The air emerging from the blanket is directed downward by the surgical drape and emerges under the operating room table and is drawn away through the laminar system's return air inlets";

c. "It's been suggested that warm air rising above the Bair Hugger blanket could interfere with the downward laminar flow toward the surgical site. It should be noted that the Bair Hugger warming unit delivers less than one percent of the airflow of a laminar flow system and the momentum of the downward air is far greater than the upward momentum imparted to the air above the blanket."

68. The statements in the preceding paragraph are false and intentionally misleading. Through those statements, Defendant disguised the fact that the issue is not the strength of the airflow in a unidirectional system but the heat of the air generated by the Bair Hugger. The cold air circulated within the operating room, having a higher density than the air heated by the Bair

Hugger, falls to the floor and forces the contaminated air, now warmed by the waste heat from the Bair Hugger, to enter the sterile field. Accordingly, the hot air is not “drawn away” from the surgical site as Defendant maintains.

69. Moreover, in a marketing video produced by Defendant, previously available at http://www.youtube.com/watch?v=0j9w5brozV4 (last visited November 11, 2013), Defendant made the following misrepresentations about the Bair Hugger:

a. “3M Bair Hugger forced-air warming does NOT influence the effectiveness of laminar flow system”;

b. Claims by conductive warming manufacturers that Bair Hugger disrupts laminar flow are “inaccurate and irresponsible”;

c. Laminar airflow is “stronger” than the convective currents created by the Bair Hugger.

70. The preceding statements are not new claims from Defendant. They have been making these intentionally misleading statements to the public and medical community for years. In an advertisement that appeared in medical publications as early as 2010, available online at http://www.fawfacts.com/_asset/zn062p/AJIC.pdf (last visited July 17, 2015), Defendant made the following false and deliberately misleading claims:

> While simple logic makes it clear that forced air warming has no impact on laminar conditions, science also supports this. A forced air warming blanket delivers less than one percent of the airflow of a laminar flow system and therefore is unable to affect laminar flow ventilation systems.

71. Scientific research published both before and after this statement has demonstrated any such assertion to be false. Not only does the exhaust generated by the Bair Hugger create convective airflow patterns that disrupt the unidirectional airflow of the operating theater, but the mobilization and release of built-up pathogenic contaminants inside the device increase the risk of surgical site infections among all patient populations.

72. Despite Defendant's admission that all internal and external testing shows that when turned to "warm," the Bair Hugger increases particles at the surgical site, Defendant and its predecessors have refused to warn physicians.

73. On the issue of warning, Defendant's corporate designee testified as follows in April of 2022:

> Q. Until this day, 3M does not warn that the Bair Hugger may increase the amount of particulates over the sterile field, correct?
>
> A. That's correct.

74. In fact, Defendant and its predecessors have taken every step imaginable to conceal and discredit peer-reviewed scientific studies that undermine their ability to market the Bair Hugger.

**E. Scientific Studies Reveal Bair Hugger Issues**

75. At all times relevant herein, Defendant, and its predecessors, knew – or should have known – that the Bair Hugger emits significant levels of internally generated airborne contaminants into the operating theater and that the exhaust generated thereby creates convective airflow patterns that disrupt the unidirectional airflow of the operating theater, dramatically increasing the risk of infection for patients undergoing surgery.

76. In the face of that research and safer alternative designs, Defendant continues to extol the benefits of the Bair Hugger to the public and healthcare providers. In a communication that appeared in HEALTHCARE PURCHASING NEWS in July 2012, for instance, Defendant's public relations and communications specialist Greta Deutsch averred: "[S]ome conductive-

warming manufacturers have alleged that forced-air warming increases bacterial contamination of operating rooms or interrupts laminar airflow. These accusations have no factual basis."[10]

77. Consistent with Defendant's prior misrepresentations, Ms. Deutsch's assertion ignored numerous studies documenting the adverse effects of the Bair Hugger.

78. These peer-reviewed publications include but are not limited to:

a. Albrecht, M., et al. Forced-air warming blowers: An evaluation of filtration adequacy and airborne contamination emissions in the operating room. *Am J Infect Control* 2011;39:321-28;

b. Leaper, D., et al. Forced-air warming: A source of airborne contamination in the operating room? *Orthopedic Rev*. 2009;1(2):e28;

c. McGovern, P., et al. Forced-air warming and ultra-clean ventilation do not mix. *J Bone and Joint Surg-Br.* 2011;93(11):1537-44;

d. Legg, A., et al. Do forced air patient-warming devices disrupt unidirectional downward airflow? *J Bone and Joint Surg-Br*. 2012;94-B:254-56;

e. Belani, K., et al. Patient warming excess heat: The effects on orthopedic operating room ventilation performance. *Anesth Analg.* 2013;117(2):406-11;

f. Dasari, K., et al. Effect of forced air warming on the performance of operating theatre laminar flow ventilation. *Anaesthesia* 2012;67:24449;

g. Avidan, M., et al. Convection warmers—not just hot air. *Anaesthesia* 1997;52:1073-76;

h. Bernards, A., et al. Persistent *Acinetobacter baumannii*? Look inside your medical equipment. *Infect Control Hosp Epidemiol.* 2004;25:1002-04;

i. Brandt, S., et al. Resistive-polymer versus forced-air warming: comparable efficacy in orthopedic patients. *Anesth Analg.* 2010;110:834-38;

j. Kimberger, O., et al. Resistive polymer versus forced-air warming: comparable heat transfer and core rewarming rates in volunteers. *Anesth Analg.* 2008;107:1621-26;

---

[10] *See* Cantrell, Susan, *Normothermia Reduces Infection*, HEALTHCARE PURCHASING NEWS (July 2012), http://www.hpnonline.com/inside/2012-07/1207-ORTempMgmt.html.

k. Legg, A., et al. Forced-air patient warming blankets disrupt unidirectional airflow. *Bone Joint J.* 2013;95-B:407-10;

l. Matsuzaki, Y., et al. Warming by resistive heating maintains perioperative normothermia as well as forced air heating. *Bn J Anaesth.* 2003;90:689-91;

m. Negishi, C., et al. Resistive-heating and forced-air warming are comparably effective. *Anesth Analg.* 2003;96:1683-87;

n. Ng, V., et al. Comparison of forced-air warming and electric heating pad for maintenance of body temperature during total knee replacement. *Anaesthesia* 2006;61:1100-04;

o. Reed, M., et al. Forced-air warming design: evaluation of intake filtration, internal microbial buildup, and airborne-contamination emissions. *Am Assoc Nurse Anesth. J* 2013;81:275-80;

p. Sigg, D.C., et al. The potential for increased risk of infection due to the reuse of convective air-warming/cooling coverlets. *Acta Anaesthesiol Scand.* 1999;43:173-76;

q. Wood, A., et al. Infection control hazards associated with the use of forced-air warming in operating theatres. *J Hosp Infect.* 2014;1-9.

79. Publication of the foregoing studies should have prompted Defendant to redesign or discontinue the Bair Hugger, or at the very least to warn about the known risk of bacterial contamination associated with Bair Hugger use. Instead, Defendant made further misrepresentations and "doubled down" on its efforts to promote the device.

80. At a minimum, Defendant, and its predecessors, should have warned patients of the known risk inherent in using the Bair Hugger in orthopedic surgeries, where patients are at even greater risk of infection given the implantation of a prosthesis.

81. Instead, amid rising criticism of the Bair Hugger among the medical community, Defendant callously, and with conscious disregard for patient safety, chose to amplify its efforts to champion the device and silence its critics.

82. Defendant has claimed there is no consensus that Bair Hugger causes PJI and that its status as the most studied warming device proves its safety. The published scientific literature tells a different story:

| **PUBLISHED STUDIES ON BAIR HUGGER** | |
|---|---|
| *Publication* | *Salient Language* |
| **Positive Epidemiologic Studies** | |
| McGovern 2011 | "A significant increase in deep joint infection, as demonstrated by an elevated infection odds ratio (3.8, p=0.024), was identified during a period when [Bair Hugger] was used compared to a period when conductive fabric was used." |
| **Negative Epidemiologic Studies** | |
| [None] | [None] |
| **Non-Epidemiologic Internal Contamination Studies & Articles** | |
| Avidan 1997 | "We conclude [Bair Huggers] are a potential source of nosocomial infection." |
| Baker 2002 | "[T]here seems insufficient evidence to justify the routine use of forced air warming units … during ultraclean orthopedic surgery." |
| Bernards 2004 | "[T]he outbreak strain was transmitted by being carried on contaminated dust from within [Bair Hugger] to the exterior during operation when a fan created an air current." |
| Beavers 2007 | "Previous outbreaks have found items such as … Bair Hugger temperature management units … to be reservoirs of infection." |

| | |
|---|---|
| Gjolaj 2009 | "A potential disadvantage is that the BH may blow contaminated air." |
| Albrecht 2009 | "Particulate emissions from [Bair Huggers] could, conceivably, be deposited onto the surgical site." |
| Albrecht 2011 | "Fifty-eight percent of the [Bair Huggers] evaluated were internally generating and emitting airborne contaminants, with microorganisms detected on the internal air path surfaces of 92.3%." |
| Reed 2013 | "Swabbing detected microorganisms within 100% of the [Bair Hugger] blowers [and] . . . 96% of [them were] emitting significant levels of internally generated airborne contaminants." |
| Tsai 2016 | "Documented complications from FAW use include an increased incidence of surgical site infections." |
| Buck 2017 | "Bair Hugger causes an increase in the number of particles … in close proximity to the surgical site." |
| ECRI 2017 | "A warming unit should have HEPA-grade or better air filters to reduce the risk that airborne dust, bacteria, and mold will be blown onto the patient or into wounds." |
| Lange 2019 | "Forced-air warming (FAW) devices … can introduce bacteria into the surgical environment, increasing both possible contamination and attributable Surgical Site Infection (SSI) risks." |
| Lange 2022 | "the Bair Hugger is contributing airborne microbes into the [operating room] air" in a "statistically significant way." particles in close proximity to the patient and surgical site should not be underestimated." |

| | |
|---|---|
| Sugai 2018 | Noting the "US Centers for Disease Control and Prevention recently issued a warning: 'Nothing that blows air should be in an operating theater, if possible'", the authors note the "clinical concern [of disruption of the operating room airflow and contamination of the surgical field] is especially severe in implant surgery where a single airborne bacterium can cause an infection," the authors conclude "identifying an effective air-free alternative is paramount." |
| **Non-Epidemiologic Airflow Disruption Studies & Articles** | |
| Tumia 2002 | "[Finding] rise in the number of colony forming units between warmer off and warmer on." |
| Moretti 2009 | "In the 20 procedures in which the Bair Hugger was used, the mean bacterial load values were significantly increased." |
| McGovern 2011 | "[Bair Hugger] generated convection currents that mobilized floor air into the surgical site area." |
| Legg 2012 | "[Bair Hugger] resulted in a significant mean increase in the temperature . . . and number of particles . . . over the surgical site." |
| Dasari 2012 [A1166] | "[Bair Hugger] generates convection current activity . . . disrupt[ing] ventilation airflows intended to clear airborne contaminants from the surgical site." |
| Legg 2013 | "The convection currents increased the particle concentration 1000-fold . . . by drawing potentially contaminated particles from below the operating table into the surgical site." |
| Belani 2013 | "[Bair Hugger] was found to establish convection currents that mobilized resident air from nonsterile areas … into the surgical site." |
| Wood 2014 | "We conclude that FAW does contaminate ultra-clean air ventilation." |
| He 2017 | "[Bair Hugger] can potentially lead to surgical site contamination in 2 ways." |

| | |
|---|---|
| Jain 2019 | "[Forced-air warming devices] were associated with substantially higher numbers of simulated particles over the operative field and <u>substantially higher rates of post-operative PJI</u>." |

**F. Bair Hugger Provides No Benefit to the Vast Majority of Patients**

83. Simultaneous to telling the medical community that the Bair Hugger was safe and effective, Defendant was aware that the device provides no benefit to the vast majority of patients.

84. The Bair Hugger provides no benefit to obese patients. In April of 2022, Defendant testified to the following regarding the Bair Hugger being useless for obese patients:

> Q. All right. And you know that in 2018, in the initial draft of the ERAS sort of best practices recommendation, they suggested not using force-air warming anymore, fair?
>
> A. So ERAS is a group of surgical specialties, and I think they're up to about, I don't know, 16 of them now, something like that; so orthopedics, cardiac, gynecological, breasts, neuro. And each one of those surgical specialties writes its own ERAS protocol; there are numerous ERAS protocols. And so whenever I present on ERAS, I have a comprehensive chart that shows which surgical specialty recommends the use of warming. So, for example, bariatric surgery, they don't recommend any warming at all.
>
> Q. Okay. Is that because it's a dirty surgery or what?
>
> A. No, it's because obese people don't get cold in surgery, so obesity is protected from hypothermia. But then, you know, almost all of the other specialties - I think there's one other specialty that doesn't recommend it. But all of the other ERAS surgical specialties, the vast majority of them, recommend warming and forced-air warming.
>
> Q. So if obese patients don't get cold, is there a warning or a precaution on the Bair Hugger at all saying you don't need to use this with obese patients?
>
> A. No.
>
> Q. Why is that?

A. Well, it’s not contraindicated. It’s just not indicated, because it's not necessary.

Q. But also if a patient isn't going to become cold because they are obese, there’s also no benefit to using the Bair Hugger, fair?

A. Yes, I would agree with that.

Q. And the only thing that the Bair Hugger does, and we can debate about whether it’s important or not clinically, but the only thing that the Bair Hugger does is warm a patient?

A. Yes.

Q. So it’s providing no benefit to those patients?

A. For obese patients. And again, we always recommend, regardless, that patients have their core temperature monitored throughout a procedure. So if they have absolutely normal core temperature intraoperatively, there would no reason to warm them.

Q. All right.

A. And that’s pretty typical of an obese patient.

85. Approximately 75% of patients receiving a total hip or knee replacement surgery are clinically obese.

86. Despite this knowledge, Defendant never informed the medical community that the Bair Hugger should not be used on obese patients.

87. Defendant has also testified that the Bair Hugger is largely ineffective for the first hour of surgery.

88. Defendant’s experts agree most joint replacement surgeries are less than one hour.

89. Defendant and its employees have testified that total knee and total hip replacement surgeries have very low complication rates.

90. Defendant and its employees have testified that for surgeries with very low complication rates, the evidence for forced air warming is exceedingly hard to justify.

91. Despite this knowledge, Defendant has never informed the medical community that the Bair Hugger should not be used in surgeries with very low complication rates.

92. In May 2022, Defendant's key opinion leader, Dr. Sessler, published a randomized controlled trial (PROTECT Study) that undermines virtually all benefits Defendant claims are associated with maintaining normothermia - the only purpose of Bair Hugger.[11]

93. PROTECT validates conclusions already reached internally at Defendant regarding scientifically invalid support for the marketing claims that Defendant continues to make to this day. Internal documents confirm the company knew, no later than 2019, that there is no current valid support for claims that patient warming results in clinical benefits for patients ranging from decreased infection to decreased morbid cardiac events to decreased need for mechanical ventilation or shorter stays in the ICU.

94. The PROTECT study was well known to Defendant, as it was a principal funder for over two years, until Defendant revoked funding half-way through the project in an attempt to terminate the study.

95. Contrary to widely held beliefs and guideline recommendations, the PROTECT trial revealed that aggressive patient warming did not meaningfully decrease the risk of postoperative mortality or morbidity, including myocardial injury, non-fatal cardiac arrest, intraoperative bleeding, or surgical site infection, and there were no clinically meaningful differences between the two study groups in terms of adverse events.

---

[11] Daniel Sessler, MD, et al, *Aggressive intraoperative warming versus routine thermal management during non-cardiac surgery (PROJECT): a multicenter, parallel group, superiority trial.* The Lancet (April 4, 2022).

96. Indeed, immediately following the PROTECT study, in the May 2022 edition of The Lancet, a comment appeared reflecting on the import of the PROTECT study titled "*Challenging dogma about perioperative warming during non-cardiac surgery.*"[12] ; In this comment, the authors note that PROTECT confirmed "active warming to maintain a temperature of 37.0 C did not improve postoperative outcomes." The authors go on to ask: "When considered in the context of current guidelines, these findings raise the question: "*how did we get it so wrong?*"

97. But, of course, internal documents confirm Defendant already knew there was not current, valid scientific support for claims that warming results in clinical benefit to patients.

**<u>FRAUDULENT CONCEALMENT</u>**

98. Through misrepresentations to the public, the medical community, and the FDA, Defendant continues to actively conceal the fact that the Bair Hugger increases the risk of infection in all types of surgeries, especially orthopedic implant surgeries.

99. Defendant continues to actively fraudulently conceal the risk associated with the Bair Hugger. Currently, Defendant's website states: "There is no conclusive evidence that the Bair Hugger system's forced-air warming causes infections" and "The bottom line: The Bair Hugger system is safe and effective."

100. Defendant knows that assertion is false. In October of 2022, Defendant's retained litigation expert, Dr. Jonathan Borak, who has been paid over $400,000 by Defendant, testified live at trial as follows:

> Q. You cannot say that the Bair Hugger did not cause Ms. O'Haver's deep joint infection?
>
> A. Yes, I agree.

[12] Flavia K Borges & Jessica Spence, *Challenging dogma about perioperative warming during non-cardiac surgery,* The Lancet (Apri14, 202:2)(emphasis added).

Q. You're not aware of any testing that shows that the Bair Hugger is safe, true?

A. I'm not aware of any evidence that it is safe.

Q. Thank you. There is no evidence that the Bair Hugger does not increase the risk of deep joint infection, true?

A. There's no evidence that it does not.

Q. There's not evidence that the Bair Hugger was safe to use in the operation that Ms. O'Haver had when the Bair Hugger was used on her, true?

A. It's true.

101. Likewise, on another Defendant funded website, it states: "There is no merit to any of those [Bair Hugger] lawsuits."

102. Defendant knows that assertion is false as well. In reversing the federal MDL judge who had excluded Plaintiffs' experts and granted summary judgment, the Eighth Circuit Court of Appeals held:

> In other words, the proposition that the increase in particles caused by the Bair Hugger includes bacteria-laden particles **finds support in the record.**
>
> The question for the MDL court was whether there was sufficient support in the factual basis for the experts' opinions that the Bair Hugger is capable of causing airflow disruption in a real-world operating room that transmits bacteria to the surgical site. The MDL court held that there was not. But, as we have just seen, **there is significant support for the proposition that the Bair Hugger independently is capable of disrupting airflow so as to transmit bacteria to the surgical site** when other airflow-disruptive variables are controlled for, and there also is empirical support for the proposition that those other variables can facilitate the Bair Hugger's airflow-disruptive effect in a real-world operating room.[13]

---

[13] *See Amador v. 3M Co. (In re Bair Hugger Forced Air Warming Devices Prods. Liab. Litig.)*, 9 F.4th 768 (8th Cir. 2021) (emphasis added).

103. On its website, Defendant claims a computational fluid dynamics ("CFD") study conducted by its paid expert, Dr. John Abraham, "rebut(s) claims from a competitor and a group of plaintiff attorneys that the warming system causes or increases the risk of surgical site infections by disrupting clean operating room airflow."

104. Defendant knows this representation is false. In October of 2022, Dr. Abraham testified live at a trial in Independence, Missouri that it would be a stretch for Defendant to claim his CFD study demonstrates that the Bair Hugger is safe.

105. On its website, Defendant states "many professional bodies, clinical experts and governmental agencies, including the FDA, agree that no studies have shown an association between the use of a FAW system and increase in SSI."

106. Defendant is aware the only epidemiologic study to study the issue, called the McGovern study, found a statistically significant association between the use of the Bair Hugger and increase in SSI (surgical site infections). In fact, the study found a 380% increased risk of infection using the Bair Hugger over a different warming device. Longtime employee, Al Van Duren, testified in January of 2022 to the following:

> Q: McGovern looked at actual infection rates, correct?
>
> A: They did.
>
> Q: And it showed an increase in infection rates of 3.8 percent [sic] with the Bair Hugger versus conductive warming, correct? 3.8 fold?
>
> A: So that was a conclusion they drew from their data, yes.
>
> Q: So that is 380 percent increased risk. That's what 3.8 fold means, correct?
>
> A: Well, 3.8 times, yes.

107. The McGovern study states the following:

> The clinical concern regarding the formation of such convection currents is twofold. First, these currents oppose the natural clean airflow patterns that are intended to sweep contaminants down and away from the surgical site.[21] Thus, contaminants released in the vicinity of the surgical site are less likely to be cleared. Secondly, the upward mobilisation of floor-level and under-drape air could potentially compromise the sterility of the surgical site, as resident air from these locations is typically laden with pathogens shed from the surgical staff.[22] Either mechanism offers a plausible explanation for the significant association between the patient warming device and the risks of SSI in this study. Further, the types of organism iso-

108. In addition to false information on its websites, Defendant continues to tamper with published literature to fraudulently conceal the defective condition of the Bair Hugger. Defendant touts findings from the 2018 International Consensus on periprosthetic joint infections as evidence that the Bair Hugger is safe and effective. However, Defendant fraudulently conceals two important facts.

109. First, the head of the International Consensus, Dr. Parvizi, was a paid consultant of Defendant, who at the time had a contract for payment of $5,000 per day.

110. Second, Defendant's paid litigation orthopedic surgeon expert, Dr. Michael Mont, who Defendant has paid over $200,000 to defend the Bair Hugger, edited every single line of the International Consensus, Dr. Mont recently testified as follows:[14]

[14] *See* O'Haver 10/7/22 trial transcript at p. 180:14-25.

Q. In fact, you testified that you went through every chapter, read every line, and edited every line of that International Consensus in 2018, right?
A. Yes. I can say that I did not read every line if they offered a disclosure. So the printed word I reviewed. I didn't read everybody's disclosures if that's what you're asking me.
Q. No, no, no. You read every line of the International Consensus document, correct, Doctor?
A. Correct.
Q. And you offered edits to almost every portion of that entire ICOS publication, right?
A. Yes.

111. Dr. Parvizi gave a copy of the draft International Consensus statement to Defendant to review before it was published.[15]

112. One of Defendant's attorneys, Corey Gordon, was provided an advance draft copy and emailed Dr. Mont asking him to make changes to the final Consensus statement.[16]

113. There is no disclosure in the final Consensus statement in the JOURNAL OF ARTHROPLASTY regarding a potential conflict or bias from Dr. Mont, Dr. Parvizi, or attempted influence from Defendant's MDL counsel.

114. Further, in an article published online, on October 30, 2019, in the "Acta Orthopaedica"; the ERAS Society TKA/THA consensus statement noted "the use of forced air-warming blankets is not recommended as there is evidence that this is associated with increased risk of infection" (McGovern *et al.* 2011, Koc *et al.* 2017).[17]

115. At some point after the ERAS Society TKA/THA consensus statement was published, the statement was retracted and amended.

---

[15] *Id.* at 95:19-24

[16] *Id.* at 95:25-96:10.

[17] Consensus statement for perioperative care in total hip replacement and total knee replacement surgery: Enhanced Recovery After Surgery (ERAS) Society recommendations', Acta Orthopedica (10/30/2019).

116. Defendant relies on what it claims is a CFD performed by Dr. Farhad Memerzedeh in 2010 as evidence the Bair Hugger has no impact on an operating room.

117. But Dr. Memarzedeh's unpublished CFD calculations were done not on a supercomputer but rather during an airplane flight.[18]

118. Further, much like the International Consensus, Dr. Memarzedeh sent Defendant a draft of his "Letter to the Editor" before it was sent to the journal for publication.[19]

119. Internal emails confirm that Dr. Memerzedeh offered to highlight certain of his results while not disclosing other results and sought Defendant's endorsement of the approach.

120. Dr. Memerzedeh's letter to the editor was never a peer reviewed study.

121. Like Dr. Mont, Dr. Mamarzedah also never disclosed any conflicts or his relationship with Defendant. Instead, Dr. Memerzedeh signed off on his Letter to the Editor noting his employment with the National Institute of Health. The implication seems to be it was an NIH sponsored study, but that is false.

## CLAIMS FOR RELIEF

### COUNT I – NEGLIGENCE

122. Plaintiff restates the allegations set forth above as if fully rewritten herein.

123. Defendant designed, developed, tested, manufactured, assembled, inspected, packaged, promoted, marketed, designed, advertised, leased, supplied, and/or sold the Bair Hugger to physicians, healthcare providers, and consumers.

124. At all times relevant to this action, Defendant had a duty to perform each of the foregoing functions with reasonable and due care for the safety and well-being of patients, including Plaintiff, who was subject to the Bair Hugger during his surgeries.

---

[18] *See* O'Haver 10/3/22 trial transcript at p. 141:16-142:16.
[19] *Id.* at 141:21-23.

125. Defendant also had a duty to warn all healthcare providers, including Plaintiff's physicians, along with all consumers, including Plaintiff, of the risks, dangers, and adverse side effects associated with the Bair Hugger.

126. Based on the following non-exhaustive list of particulars, Defendant knew or reasonably should have known that the Bair Hugger was unreasonably dangerous and defective when used as directed, intended, and designed:

a. When hot air from the Bair Hugger escapes and is pushed down to the floor of the operating theater, the hot air picks up bacteria and other pathogens from the floor. When the still warmer air begins to rise after leaving the air current caused by the Bair Hugger, bacteria from the floor of the operating theater are deposited onto the surgical site.

b. The Bair Hugger collects bacteria and other infectious pathogens in its internal airflow pathways. These pathogens are expelled from the disposable warming blanket and into the operating theater, dramatically increasing the risk of the patient developing an infection.

127. Defendant failed to exercise reasonable and due care under the circumstances and therefore breached this duty in the following ways:

a. Defendant failed to properly and thoroughly test the Bair Hugger before releasing the device to market;

b. Defendant failed to properly and thoroughly analyze the data resulting from pre-market testing of the Bair Hugger;

c. Defendant failed to conduct sufficient post-market testing and surveillance of the Bair Hugger;

d. Defendant designed, manufactured, marketed, advertised, leased, distributed, and sold the Bair Hugger to consumers, including Plaintiff and his physicians, without an adequate warning of the significant and dangerous risks of the device and without proper instructions to avoid the harm which could foreseeably occur as a result of using the device;

e. Defendant failed to exercise due care when advertising and promoting the Bair Hugger;

CASE 0:25-cv-01392-DJF    Doc. 16-8    Filed 10/05/26    Page 31 of 59

f. Defendant failed to fulfill the standard of care required of a reasonable and prudent manufacturer of surgical products, specifically including products such as the Bair Hugger; and

g. Defendant negligently continued to manufacture, market, advertise, and distribute the Bair Hugger after Defendants knew or should have known of its adverse effects and/or the availability of safer designs.

128. As designers, developers, manufacturers, inspectors, advertisers, distributors, suppliers, and sellers of the Bair Hugger, Defendant had superior knowledge of the Bair Hugger and owed a duty of care to Plaintiffs and numerous other customers.

129. It was foreseeable that Defendant's actions, omissions, and misrepresentations would lead to severe, permanent, and debilitating injuries to Plaintiff.

130. As a direct and proximate result of Defendant's actions, omissions, and misrepresentations, Plaintiff, suffered infections, requiring additional surgical procedures to clean the infected areas, removal of the implant and placement of an antibiotic spacer, a full revision surgery, and treatment with high dose antibiotics. Plaintiff has therefore suffered damages and will continue to incur medical expenses as a result of using the Bair Hugger. Plaintiff has also suffered a diminished capacity for the enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation of preexisting conditions, activation of latent conditions, and other losses and damages. Plaintiff's direct medical losses and costs include care for hospitalization, physician care, monitoring, treatment, medications, and supplies. Plaintiff has incurred and will continue to incur mental and physical pain and suffering.

WHEREFORE, Plaintiff respectfully requests that he be granted relief against Defendant as set forth in the Prayer for Relief.

## COUNT II – STRICT LIABILITY

131. Plaintiff restates the allegations set forth above as if fully rewritten herein.

132. Defendant designed, manufactured, distributed, marketed, leased, supplied, and/or sold the Bair Hugger in a defective and unreasonably dangerous condition.

133. The propensity of the Bair Hugger to cause convection currents that disrupt the downward airflow of the operating theater makes the device both dangerous when used in the way it is ordinarily used and far more dangerous than reasonably contemplated by those who regularly purchase the device and have ordinary knowledge common to the community as to the characteristics of the device, including Plaintiff and his physicians.

134. The propensity of the Bair Hugger's internal airflow pathways, including its non-HEPA compliant intake filter, to become contaminated with bacteria and other harmful pathogens also makes the Bair Hugger both dangerous when used in the way it is ordinarily used and far more dangerous than reasonably contemplated by those who regularly purchase the device, including Plaintiff and his physicians.

135. In addition, the problems associated with cleaning and decontaminating the inside of the device, along with the lack of an outlet filter that could prevent the emission of contaminants into the operating theater, makes the Bair Hugger both dangerous when used in the way it is ordinarily used and far more dangerous than reasonably contemplated by those who regularly purchase the device, including Plaintiff and his physicians.

**A. Strict Liability – Failure to Warn**

136. Plaintiff restates the allegations set forth above as if fully rewritten herein.

137. Defendant designed, manufactured, inspected, labeled, leased, distributed, marketed, sold, and otherwise released the Bair Hugger into the stream of commerce.

138. In doing so, Defendant directly advertised or marketed the Bair Hugger to the FDA, health care professionals, and consumers or persons responsible for consumers.

139. Defendant thus had a duty to warn of the risks associated with the device.

140. Defendant failed to adequately warn health care professionals and the public, including Plaintiff and his physicians, about the true risks of the Bair Hugger, including that the device would release contaminated air into the surgical field and that the vented heat from the device would mobilize contaminated air from non-sterile areas of the operating theater to the surgical site, causing infections to Plaintiff.

141. Had Defendant provided timely and reasonable warnings regarding the safety and efficacy of the Bair Hugger, those warnings would have been heeded and no healthcare professional, including Plaintiff's physicians, would have used the Bair Hugger and no patient or consumer, including Plaintiff, would have allowed use of the device.

142. Defendant's failure to provide timely and reasonable warnings, instructions, and information regarding the Bair Hugger rendered the device unreasonably dangerous and defective.

143. As a direct and proximate result of Defendant's actions, omissions, and misrepresentations, Plaintiff suffered infections, requiring additional surgical procedures to clean the infected areas, removal of the implant and placement of an antibiotic spacer, a full revision surgery, and extended treatment with high dose antibiotics. Plaintiff has therefore suffered damages and will continue to incur medical expenses as a result of using the Bair Hugger. Plaintiff, William Finley, III, has also suffered a diminished capacity for the enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation of preexisting conditions, activation of latent conditions, and other losses and damages. Plaintiff's direct medical losses and costs include care for hospitalization, physician care, monitoring, treatment, medications, and supplies. Plaintiff, William Finley, III, has incurred and will continue to incur mental and physical pain and suffering.

WHEREFORE, Plaintiff respectfully requests that he be granted relief against Defendant as set forth in the Prayer for Relief.

**B. Strict Liability – Defective Design and Manufacture**

144. Plaintiff restates the allegations set forth above as if fully rewritten herein.

145. While engaged in the manufacture and sale of the Bair Hugger, Defendant manufactured and sold the device to Plaintiff, Plaintiff's physicians, and other consumers within the steam of commerce.

146. Defendant intended and expected that the Bair Hugger would reach Plaintiff in the condition in which the device was originally manufactured and/or sold.

147. In view of the utility of the device and the risk involved in its use, the design of the Bair Hugger and/or its component parts makes the product unreasonably dangerous.

148. At all times relevant to this action, an economically and technologically feasible and safer alternative design existed for the Bair Hugger, including but not limited to airflow-free warming technologies, which in reasonable medical probability would not have impaired the utility of the design and would have prevented or significantly reduced the risk of Plaintiff's infections and subsequent injuries.

149. The Bair Hugger is thus defective in design as it is not reasonably fit, suitable, or safe for its intended purpose and its foreseeable risks exceed the benefits of its design.

150. The defective condition of the Bair Hugger made it unreasonably dangerous.

151. The Bair Hugger was expected to and did reach Plaintiff without substantial change in the condition in which it was designed, manufactured, labeled, marketed, distributed, leased, sold, and otherwise released into the stream of commerce.

152. Although Defendant knew or should have known of the risks associated with the use of the Bair Hugger, as well as the defective nature of the device and the availability of safer alternative designs, Defendant has continued to design, manufacture, distribute, market, promote, distribute, lease, supply, and sell the Bair Hugger so as to maximize sales and profits at the expense of public health and safety, in conscious disregard of the foreseeable harm caused by this device.

153. As a direct and proximate result of Defendant's actions, omissions, and misrepresentations, Plaintiff suffered infections, requiring additional surgical procedures to clean the infected areas, removal of the implant and placement of an antibiotic spacer, a full revision surgery, and extended treatment with high dose antibiotics. Plaintiff has therefore suffered damages and will continue to incur medical expenses as a result of using the Bair Hugger. Plaintiff has also suffered a diminished capacity for the enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation of preexisting conditions, activation of latent conditions, and other losses and damages. Plaintiff's direct medical losses and costs include care for hospitalization, physician care, monitoring, treatment, medications, and supplies. Plaintiff has incurred and will continue to incur mental and physical pain and suffering.

WHEREFORE, Plaintiff respectfully requests that he be granted relief against Defendant as set forth in the Prayer for Relief.

## COUNT III – BREACH OF EXPRESS WARRANTY

154. Plaintiff restates the allegations set forth above as if fully rewritten herein.

155. Defendant expressly represented to Plaintiff, other consumers, and the medical community that the Bair Hugger was safe and fit for its intended purposes and that it was of merchantable quality, adequately tested, and did not produce negative side effects.

156. Although Plaintiff, other consumers, and the medical community relied upon Defendant's express representations, as set forth above, the Bair Hugger does not conform to any of those representations because the device is not safe and causes serious and deleterious side effects, including severe and permanent injuries, to innocent consumers.

157. At all relevant times, the Bair Hugger did not perform as safely as an ordinary consumer would expect or when used as intended or in a reasonably foreseeable manner.

158. Plaintiff and his physicians, by the use of reasonable care, could not have discovered that Defendant breached their warranty or the danger in using the Bair Hugger.

159. As a direct and proximate result of Defendant's actions, omissions, and misrepresentations, Plaintiff suffered infections, requiring additional surgical procedures to clean the infected areas, removal of the implant and placement of an antibiotic spacer, a full revision surgery, and extended treatment with high dose antibiotics. Plaintiff has therefore suffered damages and will continue to incur medical expenses as a result of using the Bair Hugger. Plaintiff has also suffered a diminished capacity for the enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation of preexisting conditions, activation of latent conditions, and other losses and damages. Plaintiff's direct medical losses and costs include care for hospitalization, physician care, monitoring, treatment, medications, and supplies. Plaintiff, William Finley, III, has incurred and will continue to incur mental and physical pain and suffering.

WHEREFORE, Plaintiff respectfully requests that he be granted relief against Defendant as set forth in the Prayer for Relief.

**COUNT IV – BREACH OF IMPLIED WARRANTY**

160. Plaintiff restates the allegations set forth above as if fully rewritten herein.

161. Defendant designed, manufactured, inspected, labeled, leased, distributed, marketed, sold, and other otherwise released the Bair Hugger into the stream of commerce.

162. Defendant knew of the use for which the Bair Hugger was intended and impliedly warranted the product to be of merchantable quality and safe and fit for such use.

163. Defendant was aware that consumers, including Plaintiff, would use the Bair Hugger for treatment in conjunction with orthopedic surgical procedures.

164. Plaintiff was in privity with Defendant at all relevant times.

165. The Bair Hugger was expected to reach and did in fact reach consumers, including Plaintiff, without substantial change in the condition in which the device was originally designed, manufactured, and sold by Defendant.

166. Defendant represented through their labeling, advertising, marketing materials, presentations, publications, and regulatory submissions that the Bair Hugger was safe and, upon information and belief, fraudulently withheld and concealed information about the substantial risks of serious injury associated with using the Bair Hugger.

167. Defendant represented that the Bair Hugger was safe and/or safer than other alternative warming devices and, upon information and belief, fraudulently concealed information demonstrating that the Bair Hugger was less safe than alternative products.

168. Defendant represented that the Bair Hugger was more efficacious than other alternative devices and, upon information and belief, fraudulently concealed information regarding the true efficacy of the device.

169. In reliance upon Defendant's implied warranties, Plaintiff and his physicians used the Bair Hugger as prescribed and in the foreseeable manner normally intended, recommended, promoted, and marketed by Defendant.

170. Plaintiff, other consumers, and the medical community also reasonably relied upon the judgment and sensibility of the Defendant to sell the Bair Hugger only if the product was of merchantable quality and safe and fit for its intended use.

171. In violation of S.C. Code Ann. §§ 36-2-314, *et seq*., Defendant breached their implied warranty to Plaintiff in that the Bair Hugger was not adequately tested and was not of merchantable quality, safe, or fit for its foreseeable and reasonably intended use.

172. Plaintiff and his physicians, by the use of reasonable care, could not have discovered that Defendant breached their warranty or the danger in using the Bair Hugger.

173. As a direct and proximate result of Defendant's actions, omissions, and misrepresentations, Plaintiff suffered infections, requiring additional surgical procedures to clean the infected areas, removal of the implant and placement of an antibiotic spacer, a full revision surgery, and extended treatment with high dose antibiotics. Plaintiff has therefore suffered damages and will continue to incur medical expenses as a result of using the Bair Hugger. Plaintiff has also suffered a diminished capacity for the enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation of preexisting conditions, activation of latent conditions, and other losses and damages. Plaintiff's direct medical losses and costs include care for hospitalization, physician care, monitoring, treatment, medications, and supplies. Plaintiff has incurred and will continue to incur mental and physical pain and suffering.

WHEREFORE, Plaintiff respectfully requests that he be granted relief against Defendant as set forth in the Prayer for Relief.

**COUNT V – CONSUMER FRAUD AND/OR UNFAIR AND DECEPTIVE TRADE PRACTICES – S.C. Code Ann. §§ 39-5-10, *et seq*.**

174. Plaintiff restates the allegations set forth above as if fully rewritten herein.

175. At all times mentioned herewith the Defendant partook in "trade" or "commerce" within the meaning of S.C. Code §39-5-10.

176. Plaintiff purchased and used the Bair Hugger and suffered ascertainable losses as a result of Defendant's actions in violation of S.C. Code §39-5-10, *et seq*. protection laws.

177. Had Defendant not engaged in the deceptive conduct described herein, neither Plaintiff nor his physicians would have purchased and/or paid for the Bair Hugger; nor would Plaintiff had incurred related medical costs and injuries from using the device.

178. Defendant engaged in wrongful conduct while at the same time obtaining, under false pretenses, monies from Plaintiff and/or Plaintiff's physicians for the device that would not have been paid had Defendant not engaged in unfair and deceptive conduct.

179. Unfair methods of competition or deceptive acts or practices that were proscribed by law include the following:

a. Representing that goods or services have approval, characteristics, ingredients, uses benefits or quantities that they do not have;

b. Advertising goods or services with the intent not to sell them as advertised; and

c. Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding.

180. Plaintiff was injured by the cumulative and indivisible nature of Defendant's conduct. Each aspect of Defendant's conduct was intended to artificially create sales of the Bair Hugger.

181. Defendant has a statutory duty to refrain from unfair or deceptive acts or trade practices in the design, development, manufacture, promotion, and sale of products.

182. Defendant's deceptive, unconscionable, and/or fraudulent representations and material omissions to Plaintiff and Plaintiff's physicians constituted unfair and deceptive acts and trade practices in violation of S.C. Code Ann. §§ 39-5-10, *et seq*.

183. Under the foregoing statute, Defendant is the supplier, manufacturer, advertiser, and seller of the Bair Hugger, who is subject to liability under such legislation for unfair, deceptive, fraudulent, and unconscionable consumer sales practices.

184. The actions and omissions of Defendant are uncured or incurable.

185. Defendant's actions impact the public interest and have been repeated and continue to have the potential for repetition. As set forth in this Complaint, Defendant's unfair and deceptive actions have occurred for many years and have impacted many consumers, including but not limited to Plaintiff.

186. On information and belief, Defendant had actual knowledge of the defective and dangerous condition of the Bair Hugger and failed to take any action to cure those conditions.

187. Plaintiff and the medical community relied upon Defendant's misrepresentations and omissions in determining which patient warming device to use.

188. By reason of the unlawful acts engaged in by Defendant, and as a direct and proximate result thereof, Plaintiff has sustained economic losses and other damages and are entitled to statutory and compensatory damages in an amount to be proven at trial.

WHEREFORE, Plaintiff requests that he be granted relief against Defendant as set forth in the Prayer for Relief and as permitted by S.C. Code Ann. §§ 39-5-10, *et seq.*

**COUNT VI – NEGLIGENT MISREPRESENTATION**

189. Plaintiff restates the allegations set forth above as if fully rewritten herein.

190. Defendant negligently misrepresented the risks of use of the Bair Hugger in surgeries, particularly in surgeries of the kind that were performed on Plaintiff.

191. These misrepresentations include but are not limited to the following particulars:

a. Defendant represented through labeling, advertising, marketing materials, presentations, publications, notice letters, and regulatory submissions that the Bair Hugger had been tested and found to be safe and effective for warming patients during orthopedic surgery; and

b. Defendant represented that the Bair Hugger was safer than other patient warming systems.

192. These misrepresentations, among others alleged herein, were made by Defendant with the intent to induce Plaintiff and his physicians to use the Bair Hugger.

193. At the time of Defendant's misrepresentations and omissions, Plaintiff and his physicians were ignorant of the falsity of the statements and believed them to be true.

194. Plaintiff and his physicians reasonably relied upon Defendant's misrepresentations and omissions regarding the characteristics of the Bair Hugger.

195. Defendant therefore failed to exercise reasonable care in obtaining or communicating truthful and accurate information to Plaintiff and his physicians.

196. As a direct and proximate result of Defendant's actions, omissions, and misrepresentations, Plaintiff suffered infections, requiring additional surgical procedures to clean the infected areas, removal of the implant and placement of an antibiotic spacer, a full revision surgery, and extended treatment with high dose antibiotics. Plaintiff has therefore suffered damages and will continue to incur medical expenses as a result of using the Bair Hugger. Plaintiff has also suffered a diminished capacity for the enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation of preexisting conditions, activation of latent conditions, and other losses and damages. Plaintiff's direct medical losses and costs include care

for hospitalization, physician care, monitoring, treatment, medications, and supplies. Plaintiff has incurred and will continue to incur mental and physical pain and suffering.

WHEREFORE, Plaintiff respectfully requests that he be granted relief against Defendant as set forth in the Prayer for Relief.

## COUNT VII – FRAUDULENT MISREPRESENTATION

197. Plaintiff restates the allegations set forth above as if fully rewritten herein.

198. On information and belief, Defendant made fraudulent misrepresentations with respect to the Bair Hugger, including but not limited to the following particulars:

a. Defendant represented through labeling, advertising, marketing materials, presentations, publications, notice letters, and regulatory submissions that the Bair Hugger had been tested and found to be safe and effective for warming patients during orthopedic surgery; and

b. Defendant represented that the Bair Hugger was safer than other patient warming systems.

199. On information and belief, Defendant knew as early as 1997 that the Bair Hugger caused an increased risk of infection during surgery and that modifications it had made to the design of the Bair Hugger were contributing to the incubation and circulation of bacteria and other pathogens in and around the operating theater.

200. Despite that knowledge, Defendant continues to provide false information to Plaintiff and Plaintiff's physicians, in addition to the medical community, the FDA, and the public at large, about the safety and efficacy of the Bair Hugger, as detailed above.

201. On information and belief, Defendant knew that its representations were false, yet they willfully, wantonly, and recklessly disregarded their obligations to provide truthful representations regarding the safety and risks of the Bair Hugger to Plaintiff and Plaintiff's physicians.

202. On information and belief, the representations were made by Defendant with the intent that doctors and patients, including Plaintiff and his physicians, rely on those representations.

203. Plaintiff and his physicians did in fact rely on Defendant's representations.

204. In the absence of Defendant's representations, the Bair Hugger would not have been used in any implantation surgeries, including the surgeries at issue in this case.

205. As a direct and proximate result of Defendant's actions, omissions, and misrepresentations, Plaintiff, suffered infections, requiring additional surgical procedures to clean the infected areas, removal of the implant and placement of an antibiotic spacer, a full revision surgery, and extended treatment with high dose antibiotics. Plaintiff has therefore suffered damages and will continue to incur medical expenses as a result of using the Bair Hugger. Plaintiff has also suffered a diminished capacity for the enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation of preexisting conditions, activation of latent conditions, and other losses and damages. Plaintiff's direct medical losses and costs include care for hospitalization, physician care, monitoring, treatment, medications, and supplies. Plaintiff has incurred and will continue to incur mental and physical pain and suffering.

WHEREFORE, Plaintiff respectfully requests that he be granted relief against Defendant as set forth in the Prayer for Relief.

**COUNT VIII - FRAUDULENT CONCEALMENT**

206. Plaintiff restates the allegations set forth above as if fully rewritten herein.

207. On information and belief, Defendant fraudulently concealed information with respect to the Bair Hugger, including but not limited to the following particulars:

a. Defendant represented through labeling, advertising, marketing materials, presentations, publications, notice letters, and regulatory submissions that

the Bair Hugger had been tested and found to be safe and effective for warming patients during orthopedic surgery; and

b. Defendant represented that the Bair Hugger was safer than other patient warming systems.

208. On information and belief, Defendant knew as early as 1997 that the Bair Hugger caused an increased risk of infection during surgery and that modifications it had made to the design of the Bair Hugger were contributing to the incubation and circulation of bacteria and other pathogens in and around the operating theater.

209. Defendant had sole access to the material facts concerning the dangers and unreasonable risks of the Bair Hugger.

210. On information and belief, the concealment of information by Defendant about the risks of the Bair Hugger was intentional, and Defendant knew that its representations were false.

211. The concealment of information and the misrepresentations about the Bair Hugger were made by Defendant with the intent that doctors and patients, including Plaintiff and his physicians, would rely on those misrepresentations and omissions.

212. Plaintiff and his physicians did rely on Defendant's misrepresentations and omissions, and Plaintiff was unaware of the substantial risks of the Bair Hugger.

213. As a direct and proximate result of Defendant's actions, omissions, and misrepresentations, Plaintiff suffered infections, requiring additional surgical procedures to clean the infected areas, removal of the implant and placement of an antibiotic spacer, a full revision surgery, and extended treatment with high dose antibiotics. Plaintiff has therefore suffered damages and will continue to incur medical expenses as a result of using the Bair Hugger. Plaintiff has also suffered a diminished capacity for the enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation of preexisting conditions, activation of latent

conditions, and other losses and damages. Plaintiff's direct medical losses and costs include care for hospitalization, physician care, monitoring, treatment, medications, and supplies. Plaintiff has incurred and will continue to incur mental and physical pain and suffering.

WHEREFORE, Plaintiff respectfully requests that he be granted relief against Defendant as set forth in the Prayer for Relief.

**COUNT IX – UNJUST ENRICHMENT**

214. Plaintiff restates the allegations set forth above as if fully rewritten herein.

215. Defendant has enjoyed enormous revenues from sales of the Bair Hugger.

216. It is unjust to allow Defendant to earn revenues and retain the benefits and profits from the Bair Hugger while Plaintiff suffered injuries and damages as stated herein.

WHEREFORE, Plaintiff respectfully requests that he be granted relief against Defendant as set forth in the Prayer for Relief.

**PUNITIVE DAMAGES ALLEGATIONS**

217. Plaintiff restates the allegations set forth above as if fully rewritten herein.

218. Defendant developed the Bair Hugger in 1987 and submitted a 510(k) notification to the FDA identifying a substantially equivalent predicate device.

219. In the 510(k) application, the company claimed the Bair Hugger was "similar in design and function to the Sweetland Bed Warmer and Cast Dryer," a product manufactured by the J.T. Posey Co. from 1937 to 1942.

220. The initial 510(k) application for the Bair Hugger 200, like the Sweetland Bed Warmer and Cast Dryer, was intended solely for use outside the operating room to treat post-operative hypothermia.

221. When Defendant transitioned to the Bair Hugger 500 series for use intraoperatively, Defendant simply filed another 510(k) application, referring back to the previous devices, even though those devices were not designed to be used in an operating room.

222. Defendant admits that prior to FDA clearance of the 500 series Bair Hugger device, there was no safety validation conducted as required by the FDA.

223. The Bair Hugger device is a Class II device and the primary responsibility for safety validation for Class II devices lies with the manufacturer, here the Defendant.

224. Similarly, when Defendant transitioned to the 700 series Bair Hugger devices, it, again, failed to conduct any safety validation.

225. When Defendant developed the Bair Hugger 750, internal testing showed that neither a HEPA filter nor the M10 filter used in the Bair Hugger 505 would work on the Model 750 due to constrictions on airflow.

226. Defendant decided to use an inferior filter, known as the M20 filter, which reduced the efficiency of the filter from the 95% efficiency filter used in the Bair Hugger 500 to below 50% efficiency in the Model 750.

227. Defendant also secretly reduced the filter efficiency of the replacement for the Model 505.

228. Defendant never conducted design change safety validation testing for either model, nor did Defendant inform the FDA of the filter change.

229. Failing to inform the FDA of these material changes, while further hiding them from healthcare providers and the public, demonstrates that Defendant acted conduct was willful, wanton, careless, reckless, conscious, and evidences a deliberate disregard for the rights or safety of others.

230. No later than the mid-1990s, Defendant received reports that various clinicians had concerns that the Bair Hugger generated particles, and that those particles were capable of carrying bacteria and causing infections in surgical patients.

231. Since 2003, Defendant has been aware of various research papers and peer reviewed studies confirming Bair Hugger machines were routinely contaminated with bacteria.

232. Over the last ten years, Defendant has encountered numerous scientific studies identifying patient safety risks from use of the Bair Hugger in orthopedic surgeries.

233. Any single one of the studies identified below would have caused a reasonably prudent manufacturer to seriously investigate the issue, particularly among orthopedic patients.

234. Despite their knowledge of these studies, Defendant admits that no responsive study or investigation was ever done. By failing to do so, Defendant deliberately disregarded patient safety.

235. As early as 2009, Defendant reviewed a scientific study published in ORTHOPEDIC REVIEW entitled *Forced air warming: a source of airborne contamination in the operating room?*[20] The authors of the study not only discovered that the internal surfaces of Bair Hugger blowers were contaminated with pathogens,[21] but the findings revealed that Bair Hugger blowers emit a multitude of particles into the surgical field.[22]

---

[20] M. Albrecht, et al. *Forced air warming: a source of airborne contamination in the operating room?* ORTHOPEDIC REVIEW (October 2009).

[21] *Id.*

[22] *Id.*

236. An article published one year later in the AMERICAN JOURNAL OF INFECTION CONTROL entitled *Forced-air warming blowers: an evaluation of filtration adequacy and airborne contamination emissions in the operating room* corroborated those findings.[23]

237. Defendant was also aware of scientific evidence documenting another mechanism by which the Bair Hugger delivered bacteria to the surgical site—disruption of operating room airflow. In 2011, McGovern et al. published an article entitled *Forced air warming and ultra clean ventilation do not mix* in the renowned JOURNAL OF BONE AND JOINT SURGERY.[24] The authors tested neutrally buoyant bubbles in a simulated orthopedic operation and found that the heat exhausted from the Bair Hugger mobilizes unsterile air from the floor of the operating room to the surgical site.[25] The authors also performed a statistical analysis on joint infection rates when the Bair Hugger was in use compared to when the device was replaced with an alternative air-free warming technology.[26] The authors identified an elevated risk ratio of 3.8 when the Bair Hugger was in use compared to the air-free warming period.[27]

238. According to the MDL Plaintiffs' expert Dr. Jonathan Samet, an epidemiologist specializing in airborne particulate exposure, the McGovern study "documents a statistically significant association unlikely to be explained by confounding or other bias." In other words, based on the 3.8 risk ratio reported in the study, "the Bair Hugger device would constitute a substantial contributing cause" to deep joint infections in orthopedic patients. Defendant, however, publicly derogated the study instead of investigating its merits.

---

[23] M. Albrecht, et al. *Forced-air warming blowers: an evaluation of filtration adequacy and airborne contamination emissions in the operating room.* AMERICAN JOURNAL OF INFECTION CONTROL (November 2010).

[24] P.D. McGovern, et al. *Forced-air warming and ultra clean ventilation do not mix.* THE JOURNAL OF BONE AND JOINT SURGERY (November 2011).

[25] *Id.*

[26] *Id.*

[27] *Id.*

239. As more and more research revealed the patient safety risks of using the Bair Hugger in orthopedic surgeries, Defendant continued to deliberately disregard the truth and instead attempted to discredit the research. Based on increased temperatures and particle counts over the surgical site, two peer-reviewed studies published in 2011 found that the Bair Hugger disrupts operating room airflow and thereby causes nonsterile air to enter the sterile surgical field.[28] The same held true in 2012, as Defendant reviewed a scientific study published in the JOURNAL OF BONE AND JOINT SURGERY entitled *Forced-air patient warming blankets disrupt unidirectional airflow*[29] and another study published in ANESTHESIA & ANALGESIA entitled *Patient Warming Excess Heat: The Effects of Orthopedic Operating Room Ventilation Performance*.[30] Both studies used neutrally buoyant bubbles to track whether excess heat from the Bair Hugger mobilized bubbles and thus particles to the surgical site. In both studies, the authors found that the Bair Hugger significantly disrupted operating airflow near the surgical site.

240. If those studies were not enough to demonstrate the safety risks of using the Bair Hugger in orthopedic surgeries, Defendant also reviewed a 2013 study published in the AMERICAN ASSOCIATION OF NURSE ANESTHETISTS JOURNAL entitled *Forced-air warming design: evaluation of intake filtration, internal microbial buildup, and airborne contamination emissions.*[31] The authors evaluated the intake filtration efficiency of a Bair Hugger 750 filter and

---

[28] A.J. Legg, et al. *Do forced air patient warming devices disrupt unidirectional downward airflow? Effect of forced air warming on the performance of operating theatre laminar flow ventilation.* THE JOURNAL OF BONE AND JOINT SURGERY (February 2012); K.B. Dasari, et al. *Effect of forced air warming on the performance of operating theatre laminar flow ventilation.* ANESTHESIA (March 2012).

[29] A.J. Legg, et al. *Forced-air patient warming blankets disrupt unidirectional airflow.* THE JOURNAL OF BONE AND JOINT Surgery (March 2013).

[30] K. Belani, et al. *Patient Warming Excess Heat: The Effects of Orthopedic Operating Room Ventilation Performance.* ANESTHESIA & ANALGESIA (August 2013).

[31] M. Reed, et al. *Forced-air warming design: evaluation of intake filtration, internal microbial buildup, and airborne contamination emissions.* AANA JOURNAL (August 2013).

found it was only 63.8% efficient.[32] The authors also performed laboratory testing which found 100% of the Bair Huggers sampled were contaminated with pathogenic growth.[33] Particle counting further showed that 96% of Bair Huggers were emitting significant levels of internally generated airborne contaminants out of the hose.[34] Although the researchers recommended using HEPA filtration or redesigning the device to allow for internal cleaning,[35] Defendant ignored these recommendations even in the face of subsequent literature recommending the use of alternative patient-warming devices.[36]

241. All these studies provided substantial evidence of the patient safety risk posed by the Bair Hugger to Defendant, which Defendant either ignored or actively attempted to discredit. Based on the review of the scientific literature, there is substantial evidence of the patient safety risk posed by the Bair Hugger.

242. Defendant should have concluded, based on the published literature, that the Bair Hugger has inadequate air filtration efficiency, internal bacterial contamination (including intake and exhaust hoses), exhausts microbial contaminants, interferes with OR airflow (directional or non-directional), and can introduce particles/microbial contaminants into the surgical field. At a minimum, the full body of scientific evidence put Defendant on notice that the Bair Hugger device causally increases risk for deep joint infection during orthopedic surgeries.

243. Defendant's inaction in the face of these studies demonstrates an intentional disregard for patient safety.

---

[32] *Id.*
[33] *Id.*
[34] *Id.*
[35] *Id.*
[36] A.M. Wood, *Infection control hazards associated with the use of forced air warming in operating theatres.* JOURNAL OF HOSPITAL INFECTION (November 2014).

244. When a manufacturer of a medical device identifies a potential safety issue related to the use of the product it has the right to initiate a variety of corrective and preventive measures, including changes to the warning label and/or instructions for use.

245. In this instance, even though Defendant was well aware of the potentially life-threatening complications associated with PJI in joint replacement patients, Defendant chose not to change the label of the Bair Hugger to stop the use of the Bair Hugger in total joint replacement surgeries by stating Bair Hugger was contraindicated for use in such surgeries, which would have prohibited the use of Bair Hugger. Instead, when Defendant expanded the intended use of the Bair Hugger to include the operating room in the early 1990s, Defendant chose to remove the warning about the risk of airborne contamination.

246. Defendant knew or should have known that an increase in particulate count over the sterile fields is directly correlated with an increase in risk of PJI. Indeed, no later than 2014, Defendant knew that for every 10 CFU increase per renter the risk a patient will develop a PJI doubles.

247. Defendant knew that all studies, both internal and external, showed that when the Bair Hugger was turned to warm, there was an increase in the number of particulates over the sterile field. Defendant's corporate representative testified to that fact in March of 2017.

248. Defendant knew or should have known that physicians and healthcare providers rely on Defendant to provide adequate warnings and instructions for use of the Bair Hugger. Defendant also knew that if it indicated on its label that Bair Hugger was contraindicated for use in total joint replacement surgery, that would stop the use of Bair Hugger in such operations.

249. Defendant knew that physicians and healthcare providers, particularly orthopedic surgeons, are concerned about any device that increases particulates in the operating room, given

their correlation with known infection risk. Defendant testified to this via corporate representative deposition as follows:

> Q. You would agree that surgeons, especially orthopedic surgeons, would opine that if you increase particles over the surgical site you increase the risk of infection?
>
> A. I would agree.
>
> . . .
>
> Q. 3M is aware that orthopedic surgeons are concerned over the number of particles over the surgical site?
>
> A. Yes, we are aware of this.

250. Despite this knowledge, Defendant never warned healthcare providers or hospitals about this fact. Defendant confirmed this in a corporate representative deposition taken in April of 2022:

> Q. Until this day, 3M does not warn that the Bair Hugger may increase the amount of particulates over the sterile field, correct?
>
> A. That's correct

251. The acts and omissions of Defendant described above cannot be construed as ordinary negligence, inadvertence, or simple mistakes in judgment.

252. To the contrary, Defendant's actions were willful, wanton, careless, reckless, conscious, and show a deliberate disregard for the rights and safety of Plaintiff and others.

253. Defendant made affirmative statements that created a false impression that Bair Hugger forced air warming devices were safe, effective, and appropriate for use in operating rooms, during all orthopedic surgeries, including Plaintiff's right total knee arthroplasty.

Defendant knew these statements were false. Evidencing Defendant's knowledge of the falsity of their claims, Defendant testified via 30(6)(6) depositions as follows:

Q. Yes. Okay. And 3M is aware that every single study that looked at this issue shows an increase of particulates in absolute numbers when the Bair Hugger is used, correct?

A. Yes.

....

Q. 3M is aware that particles can carry bacteria. Correct?

A. They can

...

Q. And the company was aware that the Bair Hugger was generating heat, hot air; that hot air is going to rise and form thermal plumes; that the hot air was going to - can carry particles and bacteria; and that surgeons wanted to reduce bacteria over the surgical site, correct?

A Yes, we're generally aware of all of that. Yes.

Q. And 3M is aware that anything that increases particles over the sterile field increases the risk of infection for orthopedic surgeries?

A. It depends on the size of the particles and many things, but in theory you are correct, that any increase in particles is tried to be minimized.

...

Q. Because an increase in particles is related to an increased risk of infection. Correct?

A. As I mentioned, it depends on the size of the particles, but in theory you are correct.

...

Q. Until this day, 3M does not warn that the Bair Hugger may increase the amount of particulates over the sterile field, correct?

A. That's correct

254. In fact, Defendant know there is no evidence that the Bair Hugger is safe. In October of 2022, Defendant's own epidemiological expert, Dr. Jonathan Borak confirmed this live at trial in a Bair Hugger case, testifying as follows:


hook. The first one is you re not aware of any testing that shows that the Bair Hugger is safe, true?

A I'm not aware of any evidence that it is safe.

Q Thank you. There is no evidence that the Bair Hugger does not increase the risk of deep joint infection, true?

A There's no evidence that it does not.

255. Despite knowledge that its statements were false and its conduct was misleading, Defendant failed to correct the false impression left by their statements and conduct that use of a Bair Hugger in the operating room was appropriate for every orthopedic patient. Defendant was aware that the Bair Hugger was useless for use on obese patients. Defendant testified to the following via 30(b)(6) depositions:

Q. All right. And you know that in 2018, in the initial draft of the ERAS sort of best practices recommendation, they suggested not using force-air warming anymore, fair?

A. So ERAS is a group of surgical specialties, and I think they're up to about, I don't know, 16 of them now, something like that; so orthopedics, cardiac, gynecological, breasts, neuro. And each one of those surgical specialties writes its own ERAS protocol; there are numerous ERAS protocols. And so whenever I present on ERAS, I have a comprehensive chart that shows which surgical specialty recommends the use of warming. So, for example, bariatric surgery, they don't recommend any warming at all.

Q. Okay. Is that because it's a dirty surgery or what?

A. No, it's because obese people don't get cold in surgery, so obesity is protected from hypothermia. But then, you know, almost all of the other specialties - I think there's one other specialty that doesn't recommend it. But all of the other ERAS surgical specialties, the vast majority of them recommend warming and forced-air warming.

. . .

Q. So if obese patients don't get cold, is there a warning or a precaution on the Bair Hugger at all saying you don't need to use this with obese patients?

A. No.

Q. Why is that?

A. Well, it's not contraindicated. It's just not indicated, because it's not necessary.

. . .

Q. But also If a patient isn't going to become cold because they are obese, there's also no benefit to using the Bair Hugger, fair?

A. Yes, I would agree with that.

256. This information was never shared with medical professionals.

257. Moreover, Defendant engaged in a campaign to undermine, minimize, and malign individuals and groups that published information tending to show that Defendant's products increase the risk of surgical site infection when used in an operating room during orthopedic surgeries, such as Plaintiff's. Defendant conducted the campaign for the purpose of perpetuating the false impression created by Defendant's affirmative statements about the safety and efficacy of their Bair Hugger products. For example, Defendant's agents edited every line of the International Consensus on Periprosthetic Joint Infections 2018 findings. A fact not disclosed in the findings themselves.

258. Defendant deliberately disregarded the rights or safety of others, including Plaintiff, in the following ways:

a. Defendant designed and marketed the Bair Hugger without performing any safety validation with respect to airborne contamination;

b. Defendant secretly cut the efficiency of the Bair Hugger filter without validating the safety of the new filtration level, and Defendant hid this change from the FDA and customers, including Plaintiff;

c. Defendant was aware that the inadequate filter was causing internal contamination in Bair Hugger units;

d. Defendant willfully disregarded relevant medical research regarding the potential for the Bair Hugger to cause patient harm through disruption of the sterile surgical field;

e. Defendant engineered and manipulated scientific research to produce commercially favorable results;

f. Defendant sought to prevent, discredit, or suppress any serious scientific inquiry into the infection risk from the Bair Hugger; and

g. Defendant affirmatively misrepresented the Bair Hugger's safety and failed to warn its customers, including Plaintiff and his physicians, of the risk.

259. As a direct and proximate result of Defendant's willful, wanton, careless, reckless, conscious, and deliberate disregard for the rights and safety of their consumers, Plaintiff suffered

severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering, emotional distress, loss of enjoyment of life, and economic loss, including significant expenses for medical care and treatment which will continue in the future.

260. Defendant's aforesaid conduct was committed with knowing, conscious, careless, reckless, willful, wanton, and deliberate disregard for the rights and safety of consumers, including Plaintiff, thereby entitling Plaintiff to punitive damages in an amount appropriate to punish Defendant and deter them from similar conduct in the future.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendant, individually and jointly and severally, and request:

a. For general damages in a sum in excess of the jurisdictional minimum of this Court;

b. Pain and suffering (past and future);

c. Medical expenses (past and future);

d. Medical monitoring costs (past and future);

d. Loss of enjoyment of life (past and future);

f. Mental and emotional anguish and distress (past and future);

g. Physical impairment (past and future);

h. For pre-judgment and post-judgment interest as provided by law;

i. For compensatory damages in excess of the jurisdictional minimum of this Court;

j. For consequential damages in excess of the jurisdictional minimum of this Court;

k. For punitive damages in an amount in excess of any jurisdictional minimum of this Court and in an amount sufficient to impress upon Defendants the seriousness of their conduct and to deter similar conduct in the future;

l. For attorneys' fees, expenses, and costs of this action; and

m. For such further relief as this Court deems necessary, just, and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all claims in this Complaint so triable.

Dated: December 10, 2024

Respectfully submitted:

*/s/ Christiaan A. Marcum*
Christiaan A. Marcum (Fed. I.D. 7556)
Elizabeth Middleton Burke (Fed. I.D. 7466)
Misty Black O'Neal (Fed. I.D. 12262)
ROGERS PATRICK WESTBROOK & BRICKMAN
1037 Chuck Dawley Blvd., Bldg. A
Mount Pleasant, SC 29464
Ph: (843) 727-6500
Fax: (843) 216-6509
cmarcum@rpwb.com
bburke@rpwb.com
moneal@rpwb.com

And

Jessica A. Reynolds (La. Bar No. 34024)
**PENDLEY, BAUDIN & COFFIN**
P.O. Drawer 71
24110 Eden Street
Plaquemine, Louisiana 70765
Tel: (225) 687-6396
Fax: (225) 687-6398
E-Mail: jreynolds@pbclawfirm.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 10, 2024, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.

*/s/ Christiaan A. Marcum*
Christiaan A. Marcum